McGEE, Chief Judge.
 

 *484
 
 Respondent-Father appeals from an adjudication, disposition, and permanency planning order concluding that his son, J.M. ("the son"), was an abused juvenile; that his daughter, J.M. ("the daughter"), was a seriously neglected juvenile (together, "the children"); that it was in the children's best interests to remain in the custody of the Durham County Department of Social Services ("DSS"); and that DSS was not required
 
 *485
 
 to employ reasonable reunification efforts with Respondent-Father. We affirm in part, reverse and remand in part, and vacate in part.
 

 I.
 
 Background
 

 DSS filed a petition on 11 September 2015, alleging that the son and the daughter were abused, neglected, and dependent children. At the time the petition was filed, the son was two months old and the daughter was nearly two years old. The petition alleged that the mother brought the son to a well-baby check-up on 8 September 2015, at which the examining health professional observed "marks" on the son's neck. The son was sent to UNC hospitals for further testing. The tests, including a "skeletal survey," revealed healing fractures to his ribs, tibia, and fibula; ear and tongue bruising; subconjunctival hemorrhages ; and excoriation under the chin. The examination also revealed that the son had a history of poor weight gain due to "not being fed on a regular schedule."
 

 The children's mother revealed to DSS that Respondent-Father had: (1) "flick[ed]" the son in the chin and had punched the son in the stomach; (2) excessively disciplined the daughter by,
 
 inter alia
 
 , hitting her with a back scratcher and hitting her in the mouth; (3) engaged in domestic violence with the mother in front of the children; and (4) smoked marijuana in the presence of the children. The petition further alleged that the mother and Respondent-Father each had mental health diagnoses and that the mother had borderline intellectual functioning. According to the petition, the children's maternal grandparents lived in New York but traveled to Durham on a regular basis to care for the children. DSS obtained nonsecure custody of the children on 11 September 2015, and the trial court sanctioned placement with the grandparents.
 

 A hearing was held on DSS's petition on 12 July 2016, during which the trial court heard
 
 *833
 
 testimony from: (1) a nurse practitioner, who treated the son and was an expert in pediatrics and child maltreatment; (2) the children's maternal grandmother ("the grandmother"); and (3) a social worker supervisor familiar with the family's case. Following the hearing, the trial court entered a combined adjudication, disposition, and permanency planning order on 21 November 2016.
 

 Relevant to the present appeal, the trial court found as fact that: (1) the mother had disclosed to the grandmother and medical professionals that Respondent-Father was too rough with the son; (2) the mother had witnessed Respondent-Father being abusive to the son; (3) the son's "skeletal surveys" showed healing fractures to his ribs, tibia, and fibula, bruising to his ear and tongue, subconjunctival hemorrhages,
 
 *486
 
 and excoriation under his chin; (4) there was no history of falls or accidents to explain the son's injuries, and the injuries were consistent with instances described by the children's mother; (5) the mother witnessed Respondent-Father inappropriately disciplining the daughter; and (6) the mother was not forthcoming during a prior child protective services investigation. The trial court also found that, pursuant to a safety plan, the grandmother agreed to reside in the home with the mother and Respondent-Father agreed to move out. However, the mother subsequently recanted her statements and moved out of the home.
 

 Based on these, and other, findings of fact, the trial court concluded the son was an abused juvenile and that the daughter was a "seriously neglected" juvenile. The trial court further concluded it was in the children's best interests to remain in DSS custody; that the permanent plan for the children should be guardianship, with an alternative plan of adoption; and that reasonable reunification efforts with the mother and Respondent-Father were no longer required. Respondent-Father appeals.
 
 [1]
 

 II.
 
 Analysis
 

 Respondent-Father argues the trial court erred by: (1) making several findings of fact that were not supported by competent evidence in the record or were improperly admitted hearsay statements; (2) concluding as a matter of law that the son was an abused juvenile; (3) concluding as a matter of law that the daughter was a "seriously neglected" juvenile; and (4) relieving DSS of its responsibility to make reunification efforts without following "any applicable statutory requirements."
 

 A.
 
 Challenged Findings of Fact
 

 Respondent-Father argues four of the trial court's findings of fact were improperly made because the evidence underlying those findings was inadmissible hearsay. In addition, Respondent-Father argues that four other findings of fact were unsupported by competent evidence in the record.
 

 1.
 
 Hearsay
 

 Respondent-Father argues findings of fact 12 and 19 are unsupported by competent evidence because the testimony underlying the findings was inadmissible hearsay. These findings state:
 

 *487
 
 12. During the week prior to Labor Day, the mother contacted her mother, [the grandmother] in New York, several times a day by phone and text to attempt to tell her something. Finally, the mother called [the grandmother], informing her that [Respondent-Father] was treating the children too rough; it was serious; she didn't know how to handle it and he was abusing them.
 

 ....
 

 19. The children have been present during incidents of domestic violence between the parents. On one occasion, [mother] was holding [the son] in her arms and [Respondent-Father] hit her with a broom.
 

 As Respondent-Father argues in his brief, the only competent evidence presented at the hearing to support these findings of fact was the testimony of the grandmother. The grandmother testified that the mother called and texted on numerous instances about
 
 *834
 
 "what was going on," and that whatever was going on was "serious." In one such conversation, which occurred in September 2015, the mother reported to the grandmother that she had been a victim of physical and sexual abuse at the hands of Respondent-Father, and that Respondent-Father "was hitting [the daughter] with a broomstick." The grandmother testified that the mother told her that both the son and the daughter were present during instances of domestic violence between Respondent-Father and the mother.
 

 Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2015). Hearsay evidence is inadmissible unless an exception to the hearsay rule applies. N.C.G.S. § 8C-1, Rule 802. While we agree with Respondent-Father that this testimony, to which Respondent-Father properly objected, was hearsay, we find that the testimony was properly admitted under N.C.G.S. § 8C-1, Rule 801.
 

 N.C.G.S. § 8C-1, Rule 801 provides, in relevant part:
 

 (d) Exception for Admissions by a Party-Opponent.-A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested
 
 *488
 
 his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject[.]
 

 N.C. Gen. Stat. § 8C-1, Rule 801(d) (2015). Respondent-Father argues that the party opponent exception does not apply in this instance, because the statements in question were made by the mother, not by him. He also submits that the mother did not make them in a representative capacity, and that he did not authorize or adopt her statements.
 

 We are not persuaded by Respondent-Father's argument, as he appears to overlook the fact that the mother was also a party to the action, and her inaction was relevant to the issue of whether the children were abused or neglected. Our Supreme Court has stated that "[i]n determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent."
 
 In re Montgomery
 
 ,
 
 311 N.C. 101
 
 , 109,
 
 316 S.E.2d 246
 
 , 252 (1984).
 

 This Court addressed a nearly identical issue in
 
 In re Hayden
 
 ,
 
 96 N.C. App. 77
 
 ,
 
 384 S.E.2d 558
 
 (1989). In
 
 Hayden
 
 , the respondent-father objected to out-of-court statements made by the mother and, on appeal, he argued that the statements did not fit within the party-opponent exception to the hearsay rule. This Court rejected the respondent-father's argument in that case, and explained:
 

 At the hearing, the social workers were permitted to testify, over [the] respondent's objections, as to his wife's out-of-court statements to them that respondent did not properly care for the children, excessively disciplined them, abused illegal drugs and alcohol in their presence, and was violent in his behavior. [The r]espondent argues that these statements should have been excluded under Rule 802 in that they are hearsay, not within any exception. We disagree. [The mother] was a party to this action which was brought to determine whether her child [ ] was abused and neglected. Her statements to the social workers about [respondent's] conduct can only be reasonably considered as admissions by her that [the juvenile] was subjected to conduct in her presence which could be found to be abusive and neglectful. Within the context of this juvenile petition case, we hold that her statements were properly admitted pursuant to the provisions of Rule 801(d).
 

 *489
 

 Id.
 
 at 81,
 
 384 S.E.2d at 560-61
 
 . Like the mother's statements in
 
 Hayden
 
 , in the present case the mother was a party to the action that was brought to determine whether the children had been abused or neglected, and her statements were "reasonably considered as admissions by her that [the juvenile was] subjected to conduct in her presence which could be found to be abusive and neglectful."
 

 Id.
 

 Therefore, the mother's statements were properly admitted pursuant to N.C.G.S. § 8C-1, Rule 801(d).
 

 *835
 
 Respondent-Father also challenges findings of fact 13 and 14 as only supported by inadmissible hearsay. These findings state:
 

 13. On September 8, 2015, the mother brought [the son] to a well-baby check-up and expressed her concerns to the doctor that the father was too rough with the child. Marks on [the son's] neck and conjunctival hemorrhages (bloodshot eyes) were observed by the medical provider. [The son] was two (2) months old at the time. [The son] was sent to UNC Hospital Emergency Department for further testing.
 

 14. The mother disclosed the same information to the Emergency Department doctor. A consult was requested from the Beacon Program which reviews cases of suspected child maltreatment. [The mother] repeated the same information to [nurse practitioner] Holly Warner from the Beacon Program, specifically that on separate occasions she had witnessed [Respondent-Father] flicking [the son] under the chin, holding him upside down by his ankles, and punching him in the stomach. Respondent-mother failed to take steps to adequately protect [the son].
 

 As with findings of fact 12 and 19, Respondent-Father is correct that the testimony underlying findings of fact 13 and 14 were out-of-court statements made by the mother detailing Respondent-Father's alleged abuse of the son. The statements were made by the mother to physicians during a well-child visit and a subsequent emergency room visit. We conclude that, contrary to Respondent-Father's assertion, the testimony is a statement made for the purpose of medical diagnosis or treatment, an exception to the hearsay rule pursuant to N.C. Gen. Stat. § 8C-1, Rule 803. N.C.G.S. § 8C-1, Rule 803(4) provides, as relevant here:
 

 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 

 *490
 
 ...
 

 (4) Statements for Purposes of Medical Diagnosis or Treatment-Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
 

 N.C. Gen. Stat. § 8C-1, Rule 803(4) (2015).
 

 Our Supreme Court has articulated a two-part inquiry to determine if testimony is admissible under the Rule 803(4) hearsay exception: "(1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment."
 
 State v. Hinnant
 
 ,
 
 351 N.C. 277
 
 , 284,
 
 523 S.E.2d 663
 
 , 667 (2000). With respect to the first prong, our Supreme Court has stated that "the trial court should consider all objective circumstances of record surrounding declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)."
 
 Id.
 
 at 288,
 
 523 S.E.2d at 670
 
 .
 

 In the present case, the record establishes that the statements in question meet both of the
 
 Hinnant
 
 requirements. The statements made by the mother to the physician were made during the son's well-child visit. Following that visit, the son was immediately sent to the UNC Hospital Emergency Department. At the hospital, the mother disclosed the same information to an ER physician and to a nurse practitioner. In each instance, we find the surrounding circumstances sufficient to show that the mother's statements were made for the purpose of medical treatment and diagnosis and were related to such treatment and diagnosis.
 

 The first statement was made to a pediatrician at the son's regular two-month well-child visit. At the visit, the mother was concerned about the son's well-being, and the son's pediatrician observed marks on the son's neck and bloodshot eyes. The son's pediatrician apparently was concerned enough about the injuries that he sent the son to the ER on the same day. There, the mother again disclosed the information to a doctor and a nurse. In both instances, the statements were made to medical professionals in a hospital or medical clinic setting. At
 
 *836
 
 the time the statements were made, the extent of the son's injuries were not known, and medical professionals were attempting to diagnose them. A medical history and inquiry into these observations would have been part of any physician's attempt to diagnose the extent and cause of the
 
 *491
 
 son's injuries. Therefore, we conclude that the statements satisfy both prongs of the
 
 Hinnant
 
 test.
 

 Respondent-Father argues that the statements do not satisfy the Rule 803(4) exception because (1) the mother was not the patient, and (2) she made the statements to exculpate herself, not obtain treatment. North Carolina Courts have not considered whether N.C.G.S. § 8C-1, Rule 803(4) allows hearsay statements by persons other than the patient obtaining treatment. However, we agree with other jurisdictions, which have held that such testimony is admissible under Rule 803(4)'s hearsay exception. "Under the medical diagnosis exception to the hearsay rule, statements made by a patient for purposes of obtaining medical treatment are admissible for their truth because the law is willing to assume that a declarant seeking medical help will speak truthfully to medical personnel."
 
 Galindo v. United States
 
 ,
 
 630 A.2d 202
 
 , 210 (D.C. Ct. App. 1993). Like the District of Columbia Court of Appeals, "[w]e find no principled basis ... not to apply the same rationale to a parent who brings a very young child to a doctor for medical attention; the parent has the same incentive to be truthful, in order to obtain appropriate medical care for the child."
 

 Id.
 

 ;
 
 see also
 

 Sandoval v. State
 
 ,
 
 52 S.W.3d 851
 
 , 856-57 (Tex. Ct. App. 2001) ("[W]e conclude the fact that the information provided in the medical records came from complainant's mother does not affect the admissibility of the statements therein [under Rule 803(4) ].... In circumstances where the parent is giving the information to assist in the diagnosis and treatment of the child, we think the reliability of the statements is very high." (citation omitted)).
 

 In the present case, we note that the son was only two months old at the time his injuries were discovered and was thus unable to talk. Nothing in the plain language of Rule 803(4) or in
 
 Hinnant
 
 requires the declarant to be the patient, and Respondent-Father's reading of the exception leads to an unworkable result-he would necessarily exclude any statements made in connection with medical diagnosis or treatment for any individual who is unable to speak. As DSS and the Guardian ad Litem ("GAL") point out, the mother's statements incriminate herself in addition to Respondent-Father, because they show she took no action to stop Respondent-Father or to protect the son. We perceive no limitation on allowing the parent of a child unable to relay his or her medical condition in the plain language of N.C.G.S. § 8C-1, Rule 803(4), and such an interpretation is not in conflict with our Supreme Court's guidance in
 
 Hinnant
 
 . We therefore conclude that the statements made by the son's treating physician fall within N.C.G.S. § 8C-1, Rule 803(4)'s exception to the hearsay rule, and were properly admitted.
 

 *492
 
 2.
 
 Competent Evidence Determination
 

 Respondent-Father next challenges all or portions of findings of fact 7, 15, 17, and 18 as unsupported by competent evidence in the record. These challenged findings (or portions thereof) state:
 

 7. The family received in-home services beginning in March 2015, due to a finding of improper care based upon the mother disclosing that the father hit [the daughter].
 

 ....
 

 15. A skeletal survey showed that [the son] had healing right tibia and fibula fractures. The child also had ear bruising, sub conjunctival hemorrhages, excoriation under the chin and tongue bruising. There was no history of falls, accidents or injuries to explain the injuries. A follow-up skeletal survey two weeks later revealed healing rib fractures which were probably ten (10) days to two weeks old. [The son's] injuries were consistent with the instances described by the mother.
 

 ....
 

 17. [The daughter], had not had a physical examination since the February 2015 CME [complete medical examination].
 

 18. [The mother] witnessed [Respondent-Father] inappropriately disciplining [the
 
 *837
 
 daughter] by hitting her with a back scratcher leaving marks, slapping and hitting her in the mouth, and during one incident slapping [the daughter's] face so that her head hit the wall. The mother did not intervene to protect [the daughter] during any of these incidents.
 

 Review of a trial court's adjudication of dependency, abuse, and neglect requires a determination as to (1) whether clear and convincing evidence supports the findings of fact, and (2) whether the findings of fact support the legal conclusions.
 
 In re Pittman
 
 ,
 
 149 N.C. App. 756
 
 , 763-64,
 
 561 S.E.2d 560
 
 , 566 (citation omitted),
 
 disc. review denied
 
 ,
 
 356 N.C. 163
 
 ,
 
 568 S.E.2d 608
 
 (2002),
 
 cert. denied sub nom
 
 ,
 
 Harris-Pittman v. Nash County Dept. of Social Servs.
 
 ,
 
 538 U.S. 982
 
 ,
 
 123 S.Ct. 1799
 
 ,
 
 155 L.Ed.2d 673
 
 (2003). "In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings."
 

 *493
 

 In re Helms
 
 ,
 
 127 N.C. App. 505
 
 , 511,
 
 491 S.E.2d 672
 
 , 676 (1997) (citations omitted). If competent evidence supports the findings, they are "binding on appeal."
 
 In re McCabe
 
 ,
 
 157 N.C. App. 673
 
 , 679,
 
 580 S.E.2d 69
 
 , 73 (2003) (citations omitted).
 
 [2]
 

 As to finding of fact 7, Respondent-Father argues that DSS provided services based only on a "report," but that no one actually determined the cause of the daughter's injury before services were provided. Therefore, Respondent-Father argues, the finding is unsupported by the evidence. We disagree. The children's grandmother testified that DSS became involved in the children's lives after an incident in which Respondent-Father "had slapped [the daughter] in the eye" for no reason. The grandmother further testified that, while she was on the telephone with the mother one evening, she overheard an incident of domestic violence wherein Respondent-Father held a knife to the mother's throat. The grandmother testified that she called 911 and remained on the line with the mother until the police arrived at the scene.
 

 In addition, a DSS social worker offered testimony that contact between DSS, the mother, and Respondent-Father began in February 2015 when "[DSS] received the report that [Respondent-Father] had slapped [the daughter] in the face resulting in injury to her eye." DSS assessed a "substantiation of improper care," and the case was transferred to "in-home services within [DSS] to continue to work with the family and identify needs." We hold that this testimony serves as competent evidence to support the challenged finding of fact, which is therefore conclusive on appeal.
 
 In re Helms
 
 ,
 
 127 N.C. App. at 511
 
 ,
 
 491 S.E.2d at 676
 
 .
 

 As to finding of fact 15, Respondent-Father challenges the portion that states a follow-up "skeletal survey" was completed two weeks after the initial skeletal survey. Respondent-Father contends the follow-up survey was actually completed three weeks after the initial survey, and he argues the difference is significant, because it suggests that some of the son's injuries occurred after Respondent-Father had moved out of the family home and had no contact with the children. Therefore, he argues the one-week difference tends to prove that he did not abuse the son.
 

 Respondent-Father is correct in his assertion that the two skeletal surveys were three weeks apart, not two weeks apart, as the trial court
 
 *494
 
 found. The medical records in the record establish that the first occurred on 9 September 2015 and the second occurred exactly 21 days later, on 30 September 2015. However, we reject Respondent-Father's argument that the time difference suggests he could not have been responsible for some of the son's injuries. His theory is based on testimony from Holly Warner ("Warner"), the nurse practitioner who treated the son after he was referred to UNC Hospital. She testified as follows:
 

 When a rib fracture has just occurred, it's a very small fracture in the rib, and therefore, they're often not-you're not able to
 
 *838
 
 see it at all until it starts to heal, so-which is about seven to 14 days, depending on which radiologist you ask and the age of the child.
 

 Respondent-Father argues that, if the rib fracture detected on 30 September 2015 was seven to fourteen days old, the injury would have occurred between 16 and 23 September 2015, by which time he had no contact with the children.
 

 Respondent-Father suggests Warner definitively stated that the fracture was seven to fourteen days old, but in reality, Warner hedged her testimony as to the age of fracture, and offered a general time frame. Warner's main point was that "oftentimes a fracture can be present but you cannot see it until it starts to heal." She then stated: "So if there is healing, the fracture is thought to be
 
 at least
 
 ten to 14 days old." (emphasis added). Using the term "at least" suggests a fracture could be more than fourteen days old when it is detected by a radiologist. Furthermore, as DSS and the GAL note, the overarching theme is that the son suffered multiple fractures that were in multiple stages of healing. We hold the portion of finding of fact 15 that states the son's two skeletal surveys occurred two weeks apart to be unsupported by competent evidence, and we are not bound by that portion of the finding. However, we reject Respondent-Father's argument as to finding of fact 15 in all other respects.
 

 Respondent next challenges finding of fact 17 as unsupported by competent evidence. Respondent-Father, DSS, and the GAL all agree that this finding is erroneous. The evidence presented at the hearing showed the daughter had at least one physical examination after February 2015. We therefore are not bound by finding of fact 17.
 
 See
 

 In re McCabe
 
 ,
 
 157 N.C. App. 673
 
 , 679,
 
 580 S.E.2d 69
 
 , 73 (2003).
 

 Finally, Respondent-Father challenges finding of fact 18, which details Respondent-Father's improper discipline of the daughter, as unsupported by competent evidence. The details of Respondent-Father's
 
 *495
 
 improper discipline of the daughter were memorialized in a Complete Medical Evaluation ("CME") that was completed on the daughter in September 2015. The CME was introduced into evidence at the hearing, and it appears that none of the parties objected to its introduction. Therefore, we consider the CME to be competent evidence.
 
 See
 

 In re F.G.J.
 
 ,
 
 200 N.C. App. 681
 
 , 693,
 
 684 S.E.2d 745
 
 , 753-54 (2009) (holding that where the parties failed to raise an objection on hearsay grounds at trial, any objection was waived and the testimony in question must be considered competent evidence). Although the CME does not reference the daughter's being hit with a "back scratcher,"
 
 [3]
 
 the remainder of this finding is supported by the CME. We conclude that the portion of finding of fact 18 mentioning a back scratcher is not supported by competent evidence. However, the remainder of the finding, which details Respondent-Father's abuse of the daughter, is supported by competent evidence.
 

 III.
 
 Adjudication of the Son as an Abused Juvenile
 

 Next, we turn to Respondent-Father's challenge to the trial court's conclusion that the son was an abused juvenile. An abused juvenile is defined, in pertinent part, as one whose parent, guardian, custodian, or caretaker "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means[.]" N.C. Gen. Stat. § 7B-101(1) (2015). Respondent-Father's argument essentially rests on his challenges to various findings of fact that we rejected in the previous section. Respondent-Father argues that, without the challenged findings of fact, there is no support for the trial court's conclusion that the son was abused.
 

 As discussed above, we have rejected Respondent-Father's challenges to a majority of the findings of fact. The binding findings of fact establish that the son sustained multiple non-accidental injuries and Respondent-Father was responsible for the injuries. This Court has previously upheld adjudications of
 
 *839
 
 abuse where a child sustains non-accidental injuries, even where the injuries were unexplained.
 
 See
 

 In re C.M.
 
 ,
 
 198 N.C. App. 53
 
 , 60-62,
 
 678 S.E.2d 794
 
 , 798-99 (2009) (affirming abuse where the findings of fact established that the juvenile sustained a head injury that doctors testified was likely non-accidental, despite
 
 *496
 
 being unable to specify when or how the injury occurred);
 
 In re T.H.T.
 
 ,
 
 185 N.C. App. 337
 
 , 345-46,
 
 648 S.E.2d 519
 
 , 525 (2007),
 
 aff'd as modified
 
 ,
 
 362 N.C. 446
 
 ,
 
 665 S.E.2d 54
 
 (2008) (affirming adjudication of abuse where a juvenile sustained a non-accidental skull fracture and other injuries, the juvenile was in the physical custody of the mother, the mother's explanations were not consistent with the injuries, and the mother failed to seek prompt medical attention). Given the binding findings of fact in the present case, we hold the trial court did not err in concluding that the son was an abused juvenile.
 

 IV.
 
 Adjudication of "Serious Neglect"
 

 Next, Respondent-Father argues the trial court erred in concluding that the daughter was "seriously neglected." He contends that "seriously neglected" is not a statutory term used for adjudication pursuant to the juvenile code, and that "serious neglect" pertains only to a parent's placement on the responsible individuals' list, which is not at issue here. Therefore, he argues, the trial acted under a misapprehension of the law. We agree.
 

 N.C. Gen. Stat. § 7B-101(15) defines a neglected juvenile as
 

 A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or the custody of whom has been unlawfully transferred under G.S. 14-321.2 ; or who has been placed for care or adoption in violation of law.
 

 N.C. Gen. Stat. § 7B-101(15) (2015). A separate section of the juvenile code authorizes the North Carolina Department of Health and Human Services ("DHHS") to "maintain a central registry of abuse, neglect, and dependency cases," and also authorizes DHHS to "maintain a list of responsible individuals." N.C. Gen. Stat. § 7B-311(a) - (b) (2015). The juvenile code defines "responsible individuals" as "[a] parent, guardian, custodian, or caretaker who abuses or seriously neglects a juvenile," and defines "serious neglect," in turn, as:
 

 Conduct, behavior, or inaction of the juvenile's parent, guardian, custodian, or caretaker that evidences a disregard of consequences of such magnitude that the conduct, behavior, or inaction constitutes
 
 an unequivocal danger
 

 *497
 

 to the juvenile's health, welfare, or safety
 
 , but does not constitute abuse.
 

 N.C. Gen. Stat. § 7B-101(18a), (19a) (2015) (emphasis added).
 

 In the present case, the trial court found the daughter to be "a child who is seriously neglected[ ] due to inappropriate discipline by [Respondent-Father] and inaction by the mother which constituted
 
 an unequivocal danger to [the daughter's] health, welfare or safety
 
 ." (emphasis added). As Respondent-Father contends, the trial court used the term "serious neglect" and also employed the statutory language of N.C.G.S. § 7B-101(19a). The term "serious neglect" pertains only to placement of an individual on the responsible individuals' list and is not included as an option for adjudication in an abuse, neglect, or dependency action. The term is not used in any statutory section governing adjudicatory actions.
 
 See
 
 N.C. Gen. Stat. §§ 7B-200 (jurisdiction), -401(a) (pleadings), -802 (adjudicatory hearing), -805 (quantum of proof at adjudication).
 

 It appears the trial court was acting under a misapprehension of the law-the trial court used the definition of "serious neglect" in N.C.G.S. § 7B-101(19a), pertaining to the responsible individuals' list, as opposed to the definition of "neglect" in N.C.G.S. § 7B-101(15), pertaining to an adjudication of neglect. Therefore, we reverse the trial court's adjudication of "serious neglect" and remand the case for the trial court's consideration of neglect within the proper statutory framework.
 
 See
 

 Capps v. Lynch
 
 ,
 
 253 N.C. 18
 
 , 22,
 
 116 S.E.2d 137
 
 , 141 (1960) ("[W]here it appears
 
 *840
 
 that the judge below has ruled upon the matter before him upon a misapprehension of the law, the cause will be remanded to the superior court for further hearing in the true legal light.") (internal quotation marks and citation omitted).
 

 V.
 
 Reunification Efforts
 

 Finally, Respondent-Father argues the trial court erred in relieving DSS from making further reunification efforts without following any applicable statutory requirements. We agree. After the trial court concluded the adjudication hearing, it proceeded to a combined disposition and permanency planning hearing. The parties do not dispute the trial court's authority to combine the hearings, or its authority to address both initial disposition and permanency planning in a single order. Rather, Respondent-Father only argues that the trial court failed to follow the statutory requirements before relieving DSS of further reunification efforts.
 

 *498
 
 N.C. Gen. Stat. § 7B-901(c) authorizes the elimination of reunification efforts at an initial disposition under limited circumstances. N.C.G.S. § 7B-901(c), as relevant to the present case, provides:
 

 (c) If the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification as defined in G.S. 7B-101 shall not be required if the court makes written findings of fact pertaining to any of the following, unless the court concludes that there is compelling evidence warranting continued reunification efforts:
 

 (1) A court of competent jurisdiction has determined that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of, any of the following upon the juvenile:
 

 a. Sexual abuse.
 

 b. Chronic physical or emotional abuse.
 

 c. Torture.
 

 d. Abandonment.
 

 e. Chronic or toxic exposure to alcohol or controlled substances that causes impairment of or addiction in the juvenile.
 

 f. Any other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect.
 

 N.C. Gen. Stat. § 7B-901(c) (2015). In
 
 In re G.T.
 
 , --- N.C. App. ----,
 
 791 S.E.2d 274
 
 (2016), this Court interpreted N.C.G.S. § 7B-901(c), and concluded that, in order for a court to cease reunification efforts at the initial disposition hearing, "the dispositional court must make a finding that [a] court of competent jurisdiction has determined that the parent allowed one of the aggravating circumstances to occur."
 

 Id.
 

 at ----,
 
 791 S.E.2d at 279
 
 . Relying upon the use of the phrase "has determined" in the statute, this Court elaborated:
 

 [It] is clear and unambiguous and that in order to give effect to the term "has determined" [in N.C.G.S. § 7B-901(c),] it must refer to a prior court order. The legislature specifically used the present perfect tense in subsections (c)(1) through (c)(3) to define the determination necessary. Use of this tense indicates that the determination must have
 
 *499
 
 already been made by a trial court-either at a previously-held adjudication hearing or some other hearing in the same juvenile case, or at a collateral proceeding in the trial court. The legislature's use of the term "court of competent jurisdiction" also supports this position. Use of this term implies that another tribunal in a collateral proceeding could have made the necessary determination, so long as it is a court of competent jurisdiction.
 

 Id.
 

 "Thus," the Court concluded, "by our plain reading of the statute, if a trial court wishes to cease reunification efforts pursuant to N.C. Gen. Stat. § 7B-901(c)(1) [ ], it must make findings at disposition that a court of competent jurisdiction
 
 has already determined
 
 that the parent allowed the continuation of" one of the situations enumerated in N.C.G.S. § 7B-901(c)(1).
 
 In re G.T.
 
 at ----,
 
 791 S.E.2d at 279
 
 (emphasis added);
 
 see also
 
 N.C.G.S. §§ 7B-901(c)(1)(a)-(f).
 

 In the present case, the trial court's order does not cite to N.C.G.S. § 7B-901(c). However, because the trial court ceased reunification
 
 *841
 
 efforts in an order entered following an initial disposition hearing, N.C.G.S. § 7B-901(c) was necessarily implicated. The trial court's order concluded that "[r]eunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. Durham DSS should be relieved of further efforts to eliminate the need for the children to live outside the home." This conclusion was based on a finding using the same wording. Notably absent from the trial court's disposition is any finding indicating that a previous court had determined one of the aggravating factors to be present.
 
 See
 
 N.C.G.S. § 7B-901(c)(1). The trial court's finding of fact is insufficient to cease reunification efforts at an initial disposition hearing; under
 
 In re G.T.
 
 , --- N.C. App. at ----,
 
 791 S.E.2d at 279
 
 , the trial court's order was required to include a finding "that a court of competent jurisdiction ha[d] already determined that" one of the circumstances listed in N.C.G.S. § 7B-901(c) was present. No court of competent jurisdiction had made such a determination and, even if it had, the trial court did not make the required finding.
 

 We recognize that the trial court's initial disposition order in the present case also served as its permanency planning order. N.C. Gen. Stat. § 7B-906.2(b) permits a trial court to cease reunification efforts following a permanency planning hearing:
 

 At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. Reunification shall remain a
 
 *500
 
 primary or secondary plan unless the court made findings under G.S. 7B-901(c) or makes written findings that
 
 reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety
 
 .
 

 N.C. Gen. Stat. § 7B-906.2(b) (2015) (emphasis added). DSS and the GAL argue, and it appears, that the trial court was attempting to follow the requirements of N.C.G.S. § 7B-906.2(b) in ceasing reunification efforts, as the trial court's finding and conclusion that eliminated reunification efforts track the language of that section. Notwithstanding the trial court's effort, the plain statutory language of N.C.G.S. § 7B-901(c) requires a trial court entering an initial dispositional order that places a juvenile in the custody of a county department of social services to "direct that reasonable efforts for reunification ... shall not be required" only if the trial court "makes written findings of fact pertaining to" any of the circumstances listed in N.C.G.S. § 7B-901(c)(1)(a)-(f).
 

 We find no merit in the argument that the clear command of N.C.G.S. § 7B-901(c) may be eluded in favor of the more lenient requirements of N.C.G.S. § 7B-906.2(b) simply by combining dispositional and permanency planning matters in a single order. Because the requirements of N.C.G.S. § 7B-901(c) were not met in the present case, and consistent with
 
 In re G.T.
 
 , we vacate that portion of the trial court's order that released DSS from further reunification efforts.
 

 AFFIRMED IN PART, REVERSED AND REMANDED IN PART; VACATED IN PART.
 

 Judges DIETZ and INMAN concur.
 

 [1]
 

 The children's mother participated in the trial court proceedings, but is not a party to the present appeal.
 

 [2]
 

 Appellees have filed a joint brief, in which they first argue that Respondent-Father's appeal should be dismissed because it is moot. We find their arguments to be without merit and decline to address them.
 

 [3]
 

 Details of the back scratcher incident apparently originate from the argument of DSS's attorney at the hearing. During her opening and closing arguments, DSS's attorney asserted that the CME "talks about an incident with [the daughter] being hit with a back scratcher."